*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HOLIFIELD, STEWART, and HACKEL
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Miguel A. CHAMPION-FLORES**
Sergeant (E-5), U.S. Marine Corps
*Appellant*

**No. 202100088**

_____

Decided: 30 September 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Donald C. King (arraignment)
Melanie J. Mann (motions and trial)

Sentence adjudged 5 December 2020 by a general court-martial convened at Marine Corps Base Hawaii, Kaneohe Bay, Hawaii, consisting of enlisted members.[1] Sentence in the Entry of Judgment: reduction to E-1, confinement for thirty-two months, and a dishonorable discharge.[2]

---

[1] Pursuant to Rule for Court Martial [R.C.M.] 1002(c), Appellant requested sentencing by military judge.

[2] Appellant was credited with 216 days of pretrial confinement credit.

For Appellant:
*Lieutenant Commander Megan P. Marinos, JAGC, USN*
*Lieutenant Aiden J. Stark, JAGC, USN*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*
*Lieutenant John L. Flynn, JAGC, USN*

Judge HACKEL delivered the opinion of the Court, in which Chief
Judge HOLIFIELD and Senior Judge STEWART joined.

————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

————————————

HACKEL, Judge:

Appellant was convicted, in accordance with his pleas, of two specifications of violating a lawful order in violation of Article 92, Uniform Code of Military Justice [UCMJ], and one specification of extramarital sexual conduct in violation of Article 134, UCMJ.[3] Appellant was also convicted, contrary to his pleas, of three specifications of sexual assault in violation of Article 120, UCMJ, and one specification of indecent conduct in violation of Article 134, UCMJ.[4]

Appellant asserts six assignments of error [AOEs]: (1) the military judge abused her discretion when she denied civilian defense counsel's mid-trial motion to suppress unwarned statements made by Appellant to two other Marine Sergeants [Sgt] shortly after the sexual assault; (2) civilian defense counsel was ineffective for failing to file a motion or object before pleas to the admission of Appellant's unwarned statements as being in violation of Article 31(b), UCMJ; (3) the military judge abused her discretion when she denied Appellant the assistance of an expert consultant in forensic psychology; (4) trial counsel committed prosecutorial misconduct by making improper arguments in closing

———

[3] 10 U.S.C. §§ 892, 934.

[4] 10 U.S.C. §§ 920, 934.

and rebuttal arguments; (5) Appellant's sexual assault convictions are factually insufficient; and (6) Appellant's right to a unanimous verdict was violated.[5] We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant joined 3rd Marine Regiment, Hawaii, in July 2019, where he was assigned to the regimental communications section as a network administrator. Appellant married his spouse in February 2019 and remained married through the period relevant to this court-martial.

Lance Corporal [LCpl] Delta joined 3rd Marine Regiment in September 2019, where she was assigned to the regimental communications section as a field radio operator.[6] This was her first duty station. LCpl Delta first met Appellant in November 2019 when he returned from a unit training exercise. Although not assigned to the same work sections, Appellant and LCpl Delta became acquainted through occasional contact at work, and they also served in the same platoon under the larger communications section. Appellant was not in LCpl Delta's chain of command, nor did he and LCpl Delta have a mentor-mentee relationship.

Although married, Appellant moved into the barracks in April 2020 at the order of his command. He shared a barracks room with another sergeant in the network shop. The barracks also housed a number of other communications section Marines, including LCpl Delta.

Not long after moving in the barracks, the relationship between Appellant and LCpl Delta changed. They began speaking more frequently and communicating through social media and text messages. Their communications went beyond those typical of seniors and subordinates, to the point when Appellant sent LCpl Delta several flirtatious and sexually provocative messages. The messages surprised LCpl Delta, who felt concerned about how her responses

---

[5] We have reviewed Appellant's sixth AOE and find it to be without merit in light of our recent decision in *United States v. Causey*, 82 M.J. 574 (N-M Ct. Crim App. 2022). *See United States v. Matias,* 25 M.J. 356, 363 (C.M.A. 1987).

[6] All names in this opinion, other than those of Appellant, the judges, and appellate counsel, are pseudonyms.

would be perceived. She gave neutral "non-answers" to avoid "any kind of flash-back potentially at work."[7] For example, when Appellant messaged, "I'm curious now, would you want to [f***] me if you could?" LCpl Delta responded, "[H]onestly [I]'m in a relationship right now and [I] don't think it'd be appropriate for me to answer that."[8]

On 2 May 2020, Appellant encountered several Marines at the barracks smoke pit, including LCpl Delta. Appellant and LCpl Delta spoke casually at first, but their conversation moved to LCpl Delta's medical issues and career. Noticing LCpl Delta becoming emotional about this topic, Appellant asked if she wanted to go somewhere more private to talk, so they took a walk. They continued to talk about her medical issues, but also spoke about his relationship issues. After some time they returned to the smoke pit and Appellant suggested they watch a movie in his barracks room. She initially said it did not sound like a good idea because of the COVID social distancing restrictions, but Appellant assured her no one would get in trouble because he was a sergeant. LCpl Delta agreed to watch a movie, but asked if she could bring a friend.

Before the movie, Appellant asked LCpl Delta to drive him to the store because he had been drinking and could not drive himself. LCpl Delta drove him to the Marine Mart where he purchased snacks, soda, beer, bourbon, and tequila, all of which he brought back to his barracks room. There they joined Appellant's roommate, Sgt Sierra, and LCpl Delta's friend, LCpl Lima, to watch a movie.

During the movie Appellant offered tequila to LCpl Delta, who was underage. She refused because she did not want her senses to be impaired, nor did she consider drinking to be a good idea in a new environment with people she didn't really know.[9]

Appellant moved in and out of the room during the movie, speaking with a family member on the phone. At some point Appellant stated that he had received news that his grandmother had passed away. He became visibly emotional. Sgt Sierra asked Appellant if he wanted to go outside and take a walk with him, but Appellant refused. Instead, Appellant asked LCpl Delta to go on another walk to talk about his grandmother and to clear his head. At this point it was dark outside. LCpl Delta agreed to walk with him because, as she later

---

[7] R. at 1172.

[8] Pros. Ex. 3 at 4; R. at 1165-66 (Unless indicated otherwise, all grammar quotations are original).

[9] R. at 1191-92.

testified, "I had just seen this man cry in front of me. That's a sergeant, you know, I'd seen at a vulnerable moment and it's like they tell us: despite rank, Marines will be there for Marines."[10]

They walked to the dugout of the nearby softball field. On the way, Appellant walked in such a manner as to block anyone's view of LCpl Delta, telling her that he did not want anyone to get the wrong idea. At the dugout, they sat down and talked, but rather than discussing his grandmother, Appellant spoke about how they would be compatible as a couple. Appellant tried to kiss LCpl Delta, but she pulled away from him.

Appellant then steered the conversation to her injuries, telling LCpl Delta that he had studied massage therapy. He asked if he could feel her spine alignment, which she allowed him to do. As Appellant touched LCpl Delta's back over her shirt, he reached under her clothes and touched her back underneath her shirt. She was surprised by this, and told Appellant that it made her uncomfortable. Appellant continued touching LCpl Delta, rubbing her back. When he attempted to reach around and touch her breasts, she crossed her arms over her chest to prevent him from doing so. LCpl Delta told Appellant that she was uncomfortable, but she was nervous and did not speak loudly.

Over the next 15-20 minutes, Appellant's massage became a sexual assault. Appellant pulled LCpl Delta closer so that his chest pressed against her back. He kept one hand under her shirt, put his other hand down the front of her shorts, and touched her genitals, penetrating her vulva with his finger. LCpl Delta again told Appellant she did not want to do this, but he continued to touch her and told her to relax. Appellant then guided her into a position of lying down on her stomach and pulled down her shorts and underwear. Appellant touched her vulva and anus with his hand, penetrating both. Appellant continued telling LCpl Delta to relax because she was very rigid. Appellant then performed oral sex on LCpl Delta, placing his mouth on her anus and vulva.

When the lights from a car in the parking lot shone across the softball field in their direction, Appellant stood to block anyone's view of LCpl Delta. LCpl Delta immediately sat up and pulled up her shorts and underwear. Appellant then sat down next to her, put his arm around her shoulders, and asked, "Do you think I took advantage of you?"[11] She answered, "Yes."[12]

---

[10] R. at 1194.

[11] R. at 1210.

[12] R. at 1210.

LCpl Delta then texted her friend, Corporal [Cpl] Hotel, who came to the dugout and left with her. As soon as they were away from Appellant, LCpl Delta broke down crying and told Cpl Hotel what had happened. LCpl Delta repeated her story to Sgt Papa and Sgt Purple a short time later. Sergeants Papa and Purple then sought and located Appellant outside of his barracks. They informed Appellant that he had been "accused of something," but they did not advise him of his rights under Article 31(b), UCMJ, before to speaking with him about the allegations.[13] Appellant denied having touched LCpl Delta except to massage her back.

A law enforcement investigation into the sexual assault allegation began the next day. LCpl Delta submitted to a Sexual Assault Forensic Exam [SAFE] at Tripler Army Medical Center and Naval Criminal Investigative Service [NCIS] agents began questioning witnesses and gathering physical evidence, including a beer can left at the dugout. The SAFE exam corroborated the described sexual activity between LCpl Delta and Appellant. The beer can revealed Appellant's fingerprint.

When questioned by NCIS agents, Appellant initially denied any sexual interactions with LCpl Delta and claimed that he had only consumed a single beer on 2 May 2022. However, he later explained that he was intoxicated that day and admitted to the sexual encounter with LCpl Delta, claiming that it had been consensual. Appellant stated that, during the movie, he had spoken with his grandmother about relative who had been diagnosed with cancer. Appellant also denied bringing any beer to the dugout.

Appellant consumed alcohol throughout the day of the sexual assault. At trial, multiple witnesses described seeing him with alcohol or drinking alcohol. The witnesses opined on the amount of alcohol he had consumed and his level of intoxication. Witnesses described his slurred speech, drunken singing, and unsteady walking. No witnesses agreed completely on Appellant's level of intoxication. During his interview with NCIS agents less than 24 hours after the sexual assault, Appellant described his own level of intoxication as "three or four" out of ten.[14] During his interview with the NCIS agents, he provided a cohesive and coherent account of his interactions with LCpl Delta throughout the day and evening. In pretrial motions, the military judge denied Appellant's request for an expert consultant in forensic psychology to advise on the impact of alcohol on Appellant's mental faculties.

Additional facts necessary to address the AOEs are provided below.

---

[13] R. 877.

[14] App. Ex. XVIII at 63.

## II. DISCUSSION

### A. Motion to Suppress Unwarned Statements

Appellant argues that his statements to Sgt Papa and Sgt Purple should have been suppressed because the sergeants failed to advise him of his rights under Article 31(b), UCMJ, and the military judge abused her discretion by allowing the statements to be used as evidence at trial.

#### 1. The Military Judge Abused Her Discretion

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion and consider the evidence in the light most favorable to the party that prevailed on the motion.[15] A military judge abuses her discretion if the findings of fact upon which she predicates her ruling are not supported by the evidence in the record, if she uses incorrect legal principles, or if she applies the legal principles to the facts in a way that is clearly unreasonable.[16] To constitute an abuse of discretion, the decision must be "arbitrary, fanciful, clearly unreasonable or clearly erroneous."[17]

Article 31(b), UCMJ, provides:

> No person subject to this chapter may interrogate, or request any statement from . . . a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used against him in a trial by court-martial.[18]

"A statement obtained from the accused in violation of the accused's rights under Article 31 is involuntary and therefore inadmissible against the accused except [when in the presence of counsel]."[19] A statement is also involuntary when it is "obtained in violation of the self-incrimination privilege or the Due Process Clause of the Fifth Amendment to the United States Constitution."[20]

---

[15] *United States v. Blackburn*, 80 M.J. 205, 210-11 (C.A.A.F. 2020).

[16] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[17] *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (citation omitted).

[18] Article 31(b), UCMJ.

[19] R.C.M. 305(c)(1).

[20] Military Rule of Evidence [Mil. R. Evid.] 304(a)(1)(A).

Motions to suppress statements made in violation of Article 31(b), UCMJ, or the Constitution, "must be made by the defense prior to submission of a plea. In the absence of such motion or objection, the defense may not raise the issue at a later time except as permitted by the military judge for good cause shown. Failure to so move or object constitutes a waiver of the objection."[21]

The Defense raised no pretrial motions challenging the admissibility of Appellant's statements to Sgts Papa and Purple. However, during trial, midway through Sgt Papa's direct examination by trial counsel, CDC objected to the admissibility of Appellant's statements, requested an Article 39(a), UCMJ, session to explain his objection, and moved the court not to admit the statements. The military judge ordered the parties to submit briefs on the Government's notice requirement about the use of the statements and on their admissibility.[22] Following a recess, she considered the briefs and heard argument on the issues of notice, waiver, good cause, and admissibility of the evidence.

In attempting to explain why he had good cause to raise his objection to the evidence at this point in the trial, civilian defense counsel admitted that "[he] did not anticipate that this particular evidence was going to be used and elicited in the testimony."[23] Although the military judge did not expressly indicate that she found good cause to consider civilian defense counsel's objection, she nonetheless considered both parties' briefs, permitted argument, and ruled on the evidentiary objection. We are left to conclude that, although not explicitly stated in the record, the military judge found good cause, and thus did not consider the matter waived.

We next consider the military judge's ruling on the admissibility of Appellant's statements.[24] In the Article 39(a), UCMJ, session, the military judge quickly narrowed the issue to the admissibility of the statements, saying, "I think the main issue here that I want to get at is whether or not the statements

---

[21] Mil. R. Evid. 304(f)(1).

[22] R. at 881-82; App. Ex. XXXV and XXXVI.

[23] R. at 892-93.

[24] Civilian defense counsel did not initially object when Sgt Papa testified that Appellant said, "What are you guys talking about? I didn't touch her." R. at 877. He objected seven questions later, when trial counsel asked about the exact language Appellant used, including any profanities. During the 39(a) session, civilian defense counsel explained that he was "slow to object." R. at 885. Since the military judge ruled that all of the statements were admissible, we decline to consider whether civilian defense counsel's failure to make a timely objection forfeited the issue.

are incriminatory and whether or not there was an obligation to advise."[25] Civilian defense counsel argued that the statements did not have to be incriminating, because even non-incriminating statements could be used against Appellant to prove his consciousness of guilt and to show that he lied—"and that in and of itself is some sort of incriminating statement."[26] Trial counsel agreed that the incriminatory nature of the statements was irrelevant to the argument; what mattered was the voluntariness of the statements, which required Appellant to have been advised of his rights under Article 31(b), UCMJ.

The parties did not agree whether the sergeants were required to advise Appellant of his rights under Article 31(b), UCMJ, prior to questioning him. Civilian defense counsel explained that Sgt Papa was a person subject to the UCMJ; that he suspected Appellant of committing an offense; that a reasonable consequence of the questioning was that Appellant would make an incriminating statement; and that the questioning did, in fact, elicit a statement. Trial counsel emphasized the statements were made sergeant-to-sergeant in a non-custodial setting and were thus not involuntary per Mil. R. Evid. 305.[27]

Ultimately the military judge ruled from the bench as follows:

> [T]he fact that I wanted a bench brief, the fact that I want (sic) the government to provide one regarding notice was not for the defense. It was for the Court, for me to know exactly what information has been provided to opposing counsel and when that notice was provided. The government met its burden in showing that proper notice, in fact, had been made.
>
> They also reminded the Court that they did file a bench brief that further expanded on what they would be offering here at trial. Given the statements involved in this as well, the fact that they are—*they're not incriminating statements, that the accused denied what happened.* That has come out already at trial, the denial. That was in Prosecution Exhibit 2.
>
> It is probative, on that matter, that the government is now corroborating that statement. It's highly probative to that. There was a pre-trial motion with plenty of opportunity and notice.

---

[25] R. at 886.

[26] R. at 887-88.

[27] R. at 888-90.

9

> Therefore, the Court finds that the evidence is – that its probative value outweighs any unfair prejudice. Therefore, the defense motion is denied.[28]

Following this ruling, trial counsel advised the military judge that Sgt Purple would also be testifying about other statements made by Appellant at the same time that he and Sgt Papa confronted him. Civilian defense counsel renewed his objection to this testimony, which the military judge overruled. Sgts Papa and Purple then provided additional testimony. On cross-examination Sgt Papa clarified: "So exactly what he said was, 'What the [f***] are you talking about. I didn't [f***ing] touch her. You guys know me.'"[29] Sergeant Purple testified that when he and Sgt Papa confronted Appellant, Appellant stated, "If anyone is saying anything against me, I'm gonna talk to my lawyer."[30] Then, after being told that they just wanted his side of the story, Appellant said that he and LCpl Delta had been in contact that day, that her back was hurting, and that he told her "that he had studied or had known some massages or physical therapy that could help."[31] Appellant asked LCpl Delta "if it was ok, and she said yes; then, that [Appellant] showed her the techniques, and she was fine with it."[32]

An admission is a "self-incriminating statement falling short of an acknowledgment of guilt, even if it was intended by its maker to be exculpatory."[33] Sergeant Purple's testimony revealed several admissions by Appellant, including that he had touched LCpl Delta. Similarly, Sgt Papa's testimony that Appellant denied touching LCpl Delta could be considered as evidence of his consciousness of guilt. Consciousness of guilt evidence may be used to show "awareness of an accused that he or she has engaged in blameworthy conduct."[34] We find that the military judge mistakenly believed that only statements that are directly incriminating are subject to suppression.

---

[28] R. at 893-94 (emphasis added).

[29] R. at 909.

[30] R. at 958.

[31] R. at 930.

[32] R. at 930.

[33] Mil. R. Evid. 304(a)(1)(C).

[34] *United States v. Quezada*, 82 M.J. 54, 59 (C.A.A.F. 2021) (quoting Black's Law Dictionary 379 (11th ed. 2019)).

At the time she made her ruling, the military judge had a number of conflicting facts to consider in determining whether Appellant's statements were involuntary. First, from earlier testimony, the military judge was informed that Appellant's friend, Cpl Juliet, had already put Appellant on notice of his alleged misconduct before being confronted by the two sergeants.[35] Almost immediately after the sexual assault, LCpl Delta informed Cpl Hotel, who texted his roommate, Cpl Juliet, about LCpl Delta's allegations. Cpl Juliet then left his room, sought out Appellant, and spoke to him about the alleged assault. Sergeants Papa and Purple found Appellant a short time later with Cpl Juliet, whereupon they dismissed Cpl Juliet and confronted Appellant. Second, Appellant was confronted by fellow sergeants, not law enforcement officials or higher-ranking officers or noncommissioned officers, though Sgt Purple was serving in a senior billet as the acting staff noncommissioned officer. Third, LCpl Delta told both sergeants that Appellant had assaulted her moments before they confronted him, so they had reason to suspect him of having committed an offense. Fourth, although both sergeants were familiar with the concept of Article 31(b) rights, neither advised Appellant of those rights, even though their purpose in confronting him was to figure out what happened, get his side of the story, and gather information to make a report up the chain of command. Fifth, both sergeants opened their confrontation with Appellant by telling him that he was "accused of something."[36] And finally, the issue of whether some of Appellant's statements were spontaneous or the result of questioning was never completely resolved.

"The purpose of informing a suspect or accused of the nature of the accusation is to orient him to the transaction or incident in which he is allegedly involved."[37] It is not necessary that a servicemember being questioned be informed of "each and every possible charge under investigation," as long as the servicemember is put on notice of the "general nature of the allegation, to include the area of suspicion that focuses the [servicemember] toward the circumstances surrounding" the alleged misconduct being investigated.[38] Here it appears that Appellant was on notice of alleged misconduct from his friend, Cpl Juliet, the Marines questioning him, or both.

---

[35] R. at 825-27, 908, 910, 956-57; 959.

[36] R. at 877.

[37] *United States v. Rice,* 29 C.M.R. 340, 342 (C.M.A. 1960).

[38] *Id.* (citations omitted).

On these facts, which paint an incomplete picture, we see the question of the voluntariness of Appellant's statements as tilting towards involuntary. We understand why such a question is better developed in a pretrial motion, giving the military judge ample time to properly research and consider the issue prior to articulating her findings of facts and application of law in a ruling. Here such an analysis would have helped us in our review. Unfortunately, even considering the deference we owe to the military judge under the abuse of discretion standard, we see these critical facts and application lacking in her ruling. "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact."[39] We therefore find that the military judge abused her discretion in not granting the defense motion to suppress Appellant's statements. Additionally, we assume without deciding that Appellant's statements to Sgt Papa and Sgt Purple were involuntary within the meaning of Mil. R. Evid. 304.

*2. Harm Analysis*

Although involuntary within the meaning of Mil. R. Evid. 304, the admission of Appellant's statements to Sgt Papa and Sgt Purple did not prejudice Appellant's substantial rights.

As our superior court noted in *United States v. Evans*, "when an Article 31(b), UCMJ, violation occurs, the appropriate test for prejudice depends on the facts and circumstances presented."[40] A two-part test applies:

> If the Article 31(b), UCMJ, violation []implicates the constitutional rights of the accused, then the harmless beyond a reasonable doubt test applies. But if the Article 31(b), UCMJ, violation stands alone as a statutory violation (that is, if the violation does not also present a constitutional violation) then the nonconstitutional test for prejudice—spelled out in *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)—applies.[41]

In examining whether the failure to inform an accused of his rights under Article 31(b), UCMJ, violates his constitutional rights, we consider the nature

---

[39] *United States v. Becker*, 81 M.J. 483, 488 (C.A.A.F. 2021) (quoting *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003)).

[40] *United States v. Evans,* 75 M.J. 302, 303 (C.A.A.F. 2016).

[41] *Id.*

of the interrogation.[42] "Whether a set of facts gives rise to a custodial interrogation under *Miranda* depends upon whether a suspect reasonably believed that his freedom of action was curtailed to a degree associated with formal arrest."[43] In making this determination we consider "(1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place in which questioning occurred; and (3) the length of questioning."[44]

The conditions of the questioning do not implicate Appellant's constitutional rights. Sergeants Papa and Purple—Appellant's peers in the regimental communications section—sought out and confronted Appellant near the basketball court outside of his barracks building. He was not under arrest, though Sgt Papa did tell him that he needed to "stick around."[45] Their discussion was brief—only a few minutes. And after their conversation, Appellant returned to his barracks room and went to bed. We find that these circumstances did not lead Appellant to reasonably believe that his freedom of action was so curtailed as to be associated with formal arrest. We therefore find that Appellant was not subject to custodial interrogation by Sgts Papa and Purple, and thus suffered no violation of his Fifth Amendment rights.

We next test for prejudice associated with the statutory violation of Appellant's rights under *Kerr*, evaluating "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[46]

Here, the Government's case was strong. Per her testimony, LCpl Delta expressed, both verbally and non-verbally, her unwillingness to be touched by Appellant. She repeatedly told Appellant that she did not feel comfortable and that she did not want him to touch or penetrate her. She pulled away from Appellant after he grabbed her face and pulled her towards him. Several witnesses testified that LCpl Delta immediately reported the sexual assault and was visibly distraught and emotional immediately after the assault. Prior to the assault, Appellant had expressed his sexual interest in LCpl Delta, which she did not reciprocate. Furthermore, Appellant corroborated the details of the sexual acts during his interview with law enforcement, while claiming that

---

[42] *See United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

[43] *Evans*, 75 M.J. at 305-306 (internal citation and punctuation omitted).

[44] *Id.* at 306 (quoting *Chatfield*, 67 M.J. at 438).

[45] R. at 909.

[46] *Kerr*, 51 M.J. at 405 (citing *United States v. Weeks*, 20 M.J. 22, 25 (CMA 1985)).

LCpl Delta had consented to the acts.[47] Immediately after the sexual assault, Appellant informed his friend, Cpl Juliet, that he had touched LCpl Delta, but he later changed his story when speaking to NCIS agents, initially denying touching LCpl Delta and then admitting he engaged in sexual conduct with her. Finally, the Government presented evidence that Appellant lied about not bringing a beer can to the dugout, about his grandmother's death, and when he told LCpl Delta that Sgt Papa had told Appellant to mentor her.

Next, Appellant's case was not strong. Appellant claims he was foreclosed from presenting the strongest possible case, but he fails to explain why the statements from Sgt Papa and Sgt Purple prevented him from presenting a stronger case. Appellant called five witnesses, and his defense focused on arguing that even if LCpl Delta did not consent to the sexual acts, Appellant reasonably believed that she consented. As explained above, Appellant's defense was undermined by other strong evidence, only some of which served to diminish his credibility as a result of his *post hoc* denials.

Finally, we find that this analysis turns on the third and fourth factors. The improperly admitted statements were not material because they were cumulative to other evidence already admitted. Appellant's own denials and admissions to NCIS agents, which came into evidence as Prosecution Exhibit 2, without objection, and prior to the testimony of the two sergeants. In light of the overlap in testimony and evidence, we are persuaded that Appellant's improperly admitted statements to Sgts Papa and Purple were not qualitatively significant and did not prejudice Appellant's case.

We conclude, therefore, that the prejudicial effect of the statements was minimal. Had Appellant's statements to Sgts Papa and Purple been suppressed, we are convinced that the remaining evidence would have been adequate to overcome its absence. Having considered all of the *Kerr* factors, we find that the admission of Appellant's unwarned statements to Sgt Papa and

---

[47] Appellant did not claim at trial—and does not now—that his interview with law enforcement was obtained in violation of his Article 31(b), UCMJ, rights despite it having occurred after his statements to Sgts Papa and Purple and despite the lack of evidence that a cleansing warning was given. "[T]he absence of such [a cleansing warning] is not fatal to a finding of voluntariness." *United States v. Cuento*, 60 M.J. 106, 109 (C.A.A.F. 2004). Nonetheless, we have reviewed the totality of the circumstances surrounding Appellant's interview with law enforcement and are satisfied that his statements to NCIS agents were voluntary. *See United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F. 2006) (listing factors to be taken into account when determining the voluntariness of a statement).

Sgt Purple was harmless and did not materially prejudice Appellant's substantial rights.

## B. Ineffective Assistance of Counsel Claim

Appellant claims that his civilian defense counsel was ineffective for failing to object before pleas to the admission of Appellant's statements to Sgts Papa and Purple, which Appellant alleges were taken in violation of his Article 31(b) rights.

We review claims of ineffective assistance of counsel de novo.[48] To prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[49] An appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[50] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.[51] Furthermore, "it is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice.[52]

We resolve this issue on the prejudice prong of the *Strickland's* analysis. Appellant "must demonstrate a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different."[53] "The question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[54] A

---

[48] *United States v. Cooper*, 80 M.J. 664, 672 (N-M. Ct. Crim. App. 2020).

[49] *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (other citation omitted).

[50] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008).

[51] *Cooper*, 80 M.J. at 672.

[52] *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012). *See also, Strickland,* 466 U.S. at 697. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

[53] *Strickland*, 466 U.S. at 694.

[54] *Id.* at 695.

reasonable probability must be "sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result."[55]

Having already found that the admission of Appellant's unwarned statements to Sgts Papa and Purple were harmless, we find that Appellant has not shown a reasonable probability that, but for civilian defense counsel's errors, the members would have found reasonable doubt as to Appellant's guilt.

## C. Expert Consultant in Forensic Psychology

Appellant asserts that the military judge erred in denying the Defense's request for expert assistance from a forensic psychologist.

We review a military judge's denial of a request for expert assistance for an abuse of discretion.[56] A military judge abuses her discretion if: (1) her findings of fact are not supported by the evidence; (2) she uses incorrect legal principles; or (3) her application of the correct legal principle to the facts is clearly unreasonable.[57]

On such motions to compel, the accused has the burden of establishing a reasonable probability that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial.[58] To demonstrate necessity, the request must show: (1) why the expert is needed; (2) what the expert assistance will accomplish; and (3) why the defense would be unable to gather and present the evidence that the expert assistance would be able to develop.[59]

In a pretrial motions session, Appellant requested that the military judge order the appointment of a forensic psychologist to "advise the Defense on whether, based on the Accused's intoxication level at the time of the alleged misconduct, he could have formed the specific intent to act."[60] Appellant was charged with three specifications of sexual assault, two of which alleged that he acted with "an intent to abuse, humiliate, and degrade LCpl Delta, and to

---

[55] *Bradley*, 71 M.J. at 16 (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)) (internal punctuation omitted).

[56] *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005).

[57] *Ellis*, 68 M.J. at 344.

[58] *United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008).

[59] *United States v. Gonzalez,* 39 M.J. 459, 461 (C.M.A. 1994).

[60] App. Ex. V at 1.

arouse the sexual desire of any person."[61] In his written pleadings, Appellant stated that an expert was required "because the issues found in the case can only be properly understood and prepared for…with expert assistance."[62] Appellant supported his motion with eight enclosures in which witnesses' statements to NCIS detailed Appellant's alcohol consumption on the day of the sexual assault. Appellant identified three ways that an expert would assist the defense team and reasoned that his defense team was unable to gather and present this evidence without expert assistance because they lacked the formal training of their requested expert. Oral argument offered no additional facts or meaningful argument to bolster the written motion.[63]

The military judge denied Appellant's request. In her ruling, the military judge found that Appellant's blood alcohol content was not tested on 2-3 May 2020, and that the only evidence of Appellant's alcohol consumption or intoxication was from lay witnesses who observed him on 2 May 2020.[64] She listed several bases for her ruling. First, she identified that the evidence did not show how much alcohol Appellant had consumed.[65] Next, she identified a number of facts that pointed to Appellant's strong mental faculties on 2 May 2020: he "discussed personal life events, experiences, his marital situation, and described his acts (and their purpose) to the complaining witness. Directly following the sexual encounter, the Accused made several statements to multiple witnesses that were specific, deliberate, and reflect an overall understanding of the accusations and their seriousness."[66] Ultimately she found that "the evidence does not reasonably support the conclusion that the Accused's mental faculties impacted his actions on 2 May 2020 to the extent and degree that it require the assistance of the Defense's requested expert consultant."[67]

At trial, LCpl Delta's account of the events of 2 May 2020 largely corroborated Appellant's statement to NCIS, with the main exception being that she did not consent to the sexual acts.

---

[61] Charge Sheet.

[62] App. Ex. V at 4.

[63] See R. at 48-64.

[64] App. Ex. LI at 2.

[65] App. Ex. LI at 3.

[66] App. Ex. LI at 3.

[67] App. Ex. LI at 3.

We find that the military judge did not abuse her discretion in denying Appellant's request for a forensic psychologist. The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion; the challenged action must be "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous."[68] The military judge recognized that Appellant, as the moving party, bore the burden of proof and persuasion by a preponderance of the evidence.[69] Her findings were supported by the facts, she applied the correct legal principles, and her application of the facts to the legal principles was reasonable. The military judge's ruling was not arbitrary, fanciful, clearly unreasonable, or clearly erroneous. We thus find no abuse of discretion in her denial of the motion for expert assistance.

**D. Trial Counsel's Improper Conduct**

Appellant contends that the trial counsel committed prosecutorial misconduct during his closing and rebuttal arguments by improperly encouraging the members to put themselves in the position of the victim, by improperly vouching for the evidence, and by inserting his personal beliefs and opinions into his argument.

*1. Improper Comments*

We review prosecutorial misconduct and improper argument de novo.[70] When properly objected to at trial, we review for prejudicial error to an appellant's substantial rights.[71] "Challenged argument is reviewed not based on 'words in isolation, but on the argument viewed in context,' and 'within the context of the entire court-martial.'"[72]

"Golden Rule arguments asking the members to put themselves in the victim's place are improper and impermissible in the military justice system."[73]

---

[68] *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

[69] R. at 59; App. Ex. LI at 2; R.C.M. 905(c)(1) and (2).

[70] *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell,* 76 M.J. 14, 18 (C.A.A.F. 2017)).

[71] *Id.* (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)); *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019).

[72] *Causey*, 8 M.J. at 581 (citing *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000)) (citation and internal quotation marks omitted).

[73] *Baer*, 53 M.J. at 238.

"We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction."[74]

Prosecutorial misconduct occurs when a prosecutor "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense."[75] It is "defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon."[76] The conduct of the "trial counsel must be viewed within the context of the entire court-martial . . . not [just] on words in isolation."[77]

Near the end of his rebuttal argument, trial counsel stated,

> We often say that the glue of the Marine Corps—one of the things that we have is that it's about the Marine to the right and the Marine to the left. And that's because Marines take care of each other. Do the right thing. You had a Marine sit here on your left and ask for help. Tell you what happened—told you what happened…[78]

Civilian defense counsel objected, stating, "[T]his is improper argument. I ask that this be stricken, Your Honor. He's asking them to put—he's playing up to the passions, Your Honor. This is improper argument."[79] The military judge sustained the objection and instructed trial counsel to "[g]o ahead and close."[80] Trial counsel completed his rebuttal with three more sentences and sat down.

A short time later, civilian defense counsel requested that the military judge provide a limiting instruction regarding that portion of trial counsel's

---

[74] *Voorhees,* 79 M.J. at 12 (internal quotation marks omitted and citation omitted).

[75] *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)).

[76] *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger,* 295 U.S. at 88.).

[77] *Baer*, 53 M.J. at 238 (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)).

[78] R. at 1589.

[79] R. at 1589.

[80] R. at 1589.

closing argument to which he had successfully objected. The military judge indicated she would give the standard instruction, "which is that I had sustained an objection during trial counsel's argument and so you are to completely disregard any statements relating to that objection."[81] Civilian defense counsel replied, "Yes, Your Honor." The military judge then gave the following instruction:

> Members, at the close—during the government's closing, I sustained an objection. What that means is that, that part of the argument was improper. So what that means is that you must disregard that portion of the argument to which I sustained the objection.[82]

The members again indicated that they understood this instruction.

We find that trial counsel's comments in rebuttal argument constituted improper argument. Trial counsel's comments encouraged the members to "take care of a fellow Marine," rather than to convict based on the evidence before them. Nonetheless, as soon as the implication was before the members and before trial counsel could complete the point, civilian defense counsel objected and the military judge sustained the objection. She followed with instructions to the members, to which the members acknowledged their ability to follow. "Court members are presumed to follow the military judge's instructions," and we find nothing in the record to indicate the members were unable to follow the military judge's instructions.[83]

The weight of the evidence supports Appellant's convictions for sexual assault and indecent conduct. The members received ample evidence of the sexual acts performed by Appellant, LCpl Delta's lack of consent, and the open and notorious nature of the sexual acts.[84] As such, we cannot reach the conclusion that "trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone."[85] Therefore, while we find that the trial counsel's comments were improper, civilian defense counsel made a timely objection and the

---

[81] R. at 1596.

[82] R. at 1596.

[83] *United States v. Jenkins*, 54 M.J. 12, 20 (C.A.A.F. 2000) (citations omitted).

[84] Pros. Ex. 2; App. Ex. XVIII at 82-96; R. at 1206; R. at 496, 571, 707, 765-66; 789-91; 807-10; 849-50.

[85] *Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *United States v. Andrews,* 77 M.J. at401-02) (internal quotation marks and citation omitted).

military judge took appropriate actions to address the misconduct, and this error was not prejudicial to Appellant's substantial rights.

### 2. Use of "We" and "We Know"

We next address trial counsel's repeated use of the pronoun "we" and the phrase "we know." Within the more than 35 pages in the record constituting trial counsel's findings argument and rebuttal, we find over 30 instances of the terms "we," "we're," or "we know." Appellant raised no objections to these statements at the time.

If no objection is made, "we hold the appellant has forfeited his right to appeal and we review for plain error."[86] "The plain error doctrine is invoked to rectify those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings. As a consequence, it is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."[87] Plain error "requires that: (1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights."[88]

"Improper vouching can include the use of personal pronouns in connection with assertions that a witness was correct or to be believed."[89] Nonetheless, "the use of personal pronouns in closing argument is not *per se* a due process violation;" the "key issue is not the form but the content of such statements."[90] Similarly, a prosecutor's "closing argument need not be confined to such detached exposition as would be appropriate in a lecture."[91]

We recently addressed a similar matter in *United States v. Causey*, in which the trial counsel was alleged to have committed prosecutorial misconduct by using the pronoun "we" and the phrase "we know" during closing and rebuttal arguments, and offering his personal views of the evidence.[92] There,

---

[86] *Id.*

[87] *United States v. Fisher*, 21 M.J. 327, 328-29 (C.M.A. 1986).

[88] *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (citation and internal quotation marks omitted).

[89] *Fletcher*, 62 M.J. at 180 (citing *United States v. Washington,* 263 F. Supp. 2d 413, 431 (D. Conn. 2003)).

[90] *Causey*, 82 M.J. at 582 (internal citations omitted).

[91] *Id.*

[92] *Id.*

like here, "the trial counsel's use of pronouns was clearly directed toward urging conclusions to be drawn from the evidence," not to vouch for the evidence or to co-opt the members to become members of the Government's prosecution team.[93] To underscore our analysis and conclusion, we quote the following illustrative examples:

> He was drinking, but he wasn't so drunk he couldn't form the intent to gratify. How do *we know*? End of this video, watch it. He's still talking at the end of the video. And he says he gave—she got off. He gave her an orgasm. Gave her a couple of orgasms.[94]

> How drunk does somebody have to be incapable of trying to gratify somebody else or gratify themselves? Very, very drunk, members. Sergeant Champion-Flores was not even close. How do *we know* that Sergeant Champion-Flores was not even close? Well, he remembers everything.[95]

> There's no requirement that you continue to investigate. *We all know* the reality. This is a world of limited resources. Limited time. Why would you keep investigating after you've clearly proven the government has the evidence to prove every element beyond a reasonable doubt, which *we've* done.[96]

"An attorney's statements that indicate his opinion or knowledge of the case are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence."[97] Similar to our holding in *Causey*, we find that trial counsel's use of "we" and "we know" was properly focused on drawing reasonable conclusions from the evidence as opposed to expressing personal opinions regarding the credibility of the witnesses or other evidence. But we would reach this conclusion even if trial counsel's comments could be construed as improper. "[R]eversal is warranted only when the trial counsel's comments taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone."[98]

---

[93] *Id.*

[94] R. at 1583 (emphasis added).

[95] R. at 1473 (emphasis added).

[96] R. at 1581 (emphasis added).

[97] *Causey*, 82 M.J. at 582 (citing *United States v. Scilluffo*, 2020 CCA LEXIS 62, *62-63 (A.F. Ct. Crim. App. March 4, 2020)) (citations omitted).

[98] *Sewell*, 76 M.J. at 18.

Absent objection at trial, and applying the plain error rule, we do not find that these errors were "plain, clear, or obvious." Moreover, we find no material prejudice to Appellant's substantial rights as a result of trial counsel's use of personal pronouns.

### 3. Vouching for Witness

In response to the defense's attack in argument on the thoroughness and validity of the NCIS investigation, trial counsel made the following comment:

> Defense talked about these holes that exist in the investigation. The reason the beer can was sent out was because the question was Sergeant Champion-Flores lying to us. It answered that question. *Special Agent Bravo did a fantastic investigation in this case*. He answered all the questions that he had. He sat in that stand and he told you that when he looks at investigative leads, he follows the logical conclusions, and he answers all the questions that he needs.[99]

We recognize that in stating that "Special Agent Bravo did a fantastic job in this case," trial counsel was offering his personal opinions to bolster the credibility of one of the government's key witnesses. This statement was not objected to at trial, nor did the military judge *sua sponte* interrupt trial counsel and offer a curative instruction.

In *Vorhees*, our superior Court emphasized that "[t]he prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."[100]

Applying a plain error analysis, we find that this was improper argument and that it was "plain, clear, or obvious." At the same time, we find that it did not result in prejudicial error. Seen in the context of the surrounding argument, wherein trial counsel sought to counter the defense's attack on the thoroughness of the NCIS investigation, it is clear that had the words "Special

---

[99] R. at 1580 (emphasis added).

[100] *Voorhees*, 79 M.J. at 12 (citing *Young*, 470 U.S. at 18-19).

Agent Bravo did a fantastic job" not been spoken, the message about the validity of the investigation would still have come through clearly. In the broader context of the trial, as discussed above, Appellant fails to "demonstrate that [the] trial counsel's misconduct was 'so damaging' as to call into question whether the members convicted Appellant on the basis of the evidence alone."[101]

## E. Legal and Factual Sufficiency

Appellant asserts the evidence is factually insufficient to support his convictions for sexual assault. We review such questions de novo.[102]

### 1. Legal Sufficiency

Although not raised as an AOE, we review for legal sufficiency.[103] To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[104] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[105] After weighing the evidence in the record and making every reasonable inference in favor of the prosecution, we are satisfied a reasonable fact finder could have found all of the essential elements of each charge and specification beyond a reasonable doubt. We therefore find Appellant's convictions for sexual assault and indecent conduct are legally sufficient.

### 2. Factual Sufficiency

In evaluating factual sufficiency, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of [Appellant's] guilt beyond a reasonable doubt."[106] In conducting this unique appellate function,

---

[101] *Id.* (quoting *Sewell*, 76 M.J. at 18).

[102] Article 66(d)(1), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[103] Article 66(d)(1), UCMJ.

[104] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[105] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

[106] *Turner*, 25 M.J. at 325.

we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[107] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[108]

To be found guilty of sexual assault, Appellant must have committed a sexual act upon LCpl Delta without her consent.[109] Appellant does not contest whether the charged sexual acts happened. The evidence at trial, including Appellant's admissions to NCIS, establishes beyond a reasonable doubt that he committed the sexual acts on LCpl Delta.[110]

With regard to the second element, "[c]onsent means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent."[111] Lance Corporal Delta testified that she repeatedly—both verbally and non-verbally—rejected Appellant's advances during the sexual acts. Further, LCpl Delta showed no sexual interest in Appellant in the weeks, days, hours, and minutes before the sexual acts. The evidence at trial establishes beyond a reasonable doubt LCpl Delta did not consent to the sexual acts.

Appellant asserts the affirmative defense of his mistake of fact about LCpl Delta's lack of consent. He states that while performing the sexual acts on LCpl Delta, he never perceived any sign of her lack of consent; he claims never to have heard her say "no" or "stop," and she offered no resistance to his touches. Additionally, he emphasizes that LCpl Delta admitted that, due to her quiet voice, his position, and the windy evening, Appellant may not have heard when she expressed her discomfort during the massage. Relying on this Court's previous holding in *United States v. Brown*, in which we set aside the findings of guilty and sentence where we found mistake of fact in a sexual assault case, Appellant contends these factors should lead us to a similar conclusion.[112]

---

[107] *Washington*, 57 M.J. at 399.

[108] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[109] Art. 120, UCMJ.

[110] Pros. Ex. 2; App. Ex. XVIII at 82-96.

[111] 10 USC § 920(g)(7)(A).

[112] Appellant's Brief at 55 (citing *United States v. Brown*, 2018 CCA LEXIS 316 at *34 (N-MC Ct. Crim. App. July 2, 2018)).

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense."[113] If the mistake goes to an element requiring specific intent, "the ignorance or mistake need only have existed in the mind of the accused."[114] However, if the "mistake goes to any other element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances."[115]

We find that the prosecution met its burden of proving beyond a reasonable doubt that the defense of mistake of fact did not exist because Appellant's mistake of fact was not reasonable under all the circumstances. Appellant was a married sergeant senior in grade to LCpl Delta, with whom he had no romantic history. Upon moving into the barracks, he engaged in several one-sided, increasingly sexually-charged text and social media exchanges. On the day of the sexual assault, he spent hours speaking with her—predominantly in the context of a fellow Marine and friend, not as someone with whom he expected a sexual relationship. However, he attempted to isolate her and make the relationship sexual. As she testified, during these moments, LCpl Delta clearly communicated her lack of interest in a romantic or sexual relationship: during their two walks together that day and evening, when Appellant moved closer to her, called her beautiful, stated that they would be compatible, asked to kiss her, or pulled her closer, she repeatedly rebuffed his advances, either laughing off the comments or pulling away. Later, during the massage and in the moment of the sexual acts, in addition to covering her breasts to prevent him from touching them, and with her body going "rigid," "frozen," and "tense," LCpl Delta repeatedly stated that she "didn't feel comfortable," to which his response was to tell her to "relax" while continuing to touch her vagina and anus.[116] We find beyond a reasonable doubt that regardless of whether Appellant subjectively mistook LCpl Delta's lack of resistance as consent for oral sex, he neglected or ignored a host of other conflicting signals. His mistake of fact, if any, was not objectively reasonable.

---

[113] R.C.M. 916(j).

[114] *Id.*

[115] *Id.*

[116] R. at 1198, 1200-08.

Finally, we must consider whether Appellant's intoxication affected his mistake of fact about LCpl Delta's consent, or his ability to form the intent to carry out the sexual assaults charged in the second and third specifications. Although not a defense, evidence of voluntary intoxication may be introduced to raise a reasonable doubt about an accused's specific intent when it is an element of the offense.[117] With regard to Appellant's intoxication relative to his mistake of fact, the military judge correctly provided the following instruction:

> There has been some evidence concerning the accused's state of intoxication at the time of the alleged offense. On the question of whether the accused's ignorance or belief was reasonable, you may not consider the accused's intoxication, if any, because a reasonable ignorance or belief is *one that an ordinary, prudent, sober adult would have under the circumstances of this case*. Voluntary intoxication does not permit what would be an unreasonable ignorance or belief in the mind of a sober person to be considered reasonable because the person is intoxicated.[118]

Consistent with the military judge's instruction, and as described above, we find that an ordinary, prudent, sober adult would not have mistaken LCpl Delta's speech or conduct as consent for sexual contact.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt and find that the evidence is factually sufficient to support Appellant's convictions.

---

[117] R.C.M. 916(l)(2).

[118] App. Ex. XLVI at 3 (emphasis added).

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[119]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[119] Articles 59 & 66, UCMJ.